IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

AETNA INC., et al.,                       :
                                          :
                                          :
                                          :       No. 07-5541
          v.                              :
                                          :
                                          :
                                          :
EXPRESS SCRIPTS, INC., et al.             :

Goldberg, J.                                          September 16,  2009

## MEMORANDUM OPINION

## I. Introduction

This case involves allegations that Defendants, Express Scripts, Inc., and their subsidiary,

CuraScripts, Inc., tortiously interfered with an agreement termed the "Drug Supply Agreement"

("DSA"), which was entered into between Plaintiffs, Aetna, Inc., et al. ("Aetna")[1] and Priority

Healthcare Corporation ("Priority"). The purpose of the DSA was to allow Aetna to purchase

prescription drugs through Priority, which, due to its favorable position in the pharmaceutical

market, was able to obtain "best prices" for specialty pharmaceutical products.

Presently before the Court are two motions filed by Defendants seeking to exclude all, or

significant portions of the anticipated trial testimony of Plaintiffs' damages expert, Robert J.

DeLuca.  In the first motion, Defendants move to preclude opinions set forth in DeLuca's errata

---

[1]Plaintiffs in this matter include Aetna, Inc., Aetna Specialty Pharmacy, LLC and Aetna
Health Holdings, LLC.

sheet, submitted after his second deposition, which Defendants argue was improperly prepared. Defendants have also raised a <u>Daubert</u> challenge, claiming that DeLuca's opinions do not satisfy the reliability prong of <u>Daubert</u> and Fed. R. Civ. P. 702.  Additionally, Defendants asserted during oral argument that DeLuca's errata sheet contains unreliable expert opinions and, thus, should also be excluded under <u>Daubert</u>.

For the reasons set forth below, the Court is not persuaded that DeLuca's testimony should be excluded and, thus, Defendants' motions will be denied.

## II.  <u>Procedural History</u>

In August 2004, Aetna and Priority contracted to create Aetna Specialty Pharmacy ("ASP") for the purpose of "establishing, building, owning and operating a stand alone integrated specialty pharmacy business." (Pl.'s Compl., ¶ 18.) Plaintiffs anticipated that partnering with Priority would be advantageous because Priority operated as a pharmacy and distributor of speciality pharmaceutical products and had "increased purchasing power," which would allow Aetna to obtain "best" or preferential pricing for those products.  (Pl.'s Compl., ¶¶ 20, 29-30.)  On October 14, 2005, less than two years after the consummation of the DSA, Defendants acquired Priority and 100% of Priority stock.

Plaintiffs commenced this action for tortious interference of contract on December 31, 2007, primarily alleging that Defendants, a direct competitor of ASP, caused Priority to breach the DSA. According to Plaintiffs, Defendants' interference and Priority's violation of the DSA caused excessive monetary losses in that they paid higher prices for various drugs.  Plaintiffs retained DeLuca, a C.P.A. with extensive experience in the health care industry, to opine on the approximate amount of these damages.  DeLuca essentially reached his conclusions by comparing the price

Priority paid, or could have paid, with the price ASP actually paid and then multiplied that price difference by the quantity of drugs ASP purchased.   (See generally, November 7, 2008 DeLuca Rept**.**)

Pursuant to the Honorable Timothy J. Savage's April 7, 2008 Scheduling Order, all fact discovery was to be completed by October 3, 2008; expert reports and discovery were due on November 7, 2008; rebuttal expert reports were due on November 21, 2008; and expert depositions were to be completed by December 19, 2008.  The deadlines for submission of expert reports and depositions as it relates to DeLuca were extended by agreement.

Plaintiffs noticed the deposition of Defendants' 30(b)(6) witness on June 18, 2008,  and Defendants designated Travis Krajco, Manager of Procurement for CurasScript, Inc., as their 30(b)(6) witness.  Krajco's deposition occurred on September 25, 2008, wherein Plaintiffs' counsel asked Krajco questions in order to understand how to interpret certain sales data produced by Defendants.   On November 7, 2008, DeLuca submitted his first expert report and he was subsequently deposed on December 18, 2008.  DeLuca submitted a second report ("rebuttal") on January 30, 2009.

On February 20, 2009, defense counsel sent Plaintiffs' counsel a nine-page, single-spaced letter, with numerous exhibits, challenging DeLuca's opinions.  Specifically, this correspondence asserted that DeLuca had incorrectly interpreted data previously produced by Defendants, thus rendering his ultimate calculations and opinions incorrect.

One week later, DeLuca was deposed a second time and was presented with the February 20, 2009 correspondence, which he had not previously reviewed.  Despite strenuous objections from Plaintiffs' counsel, Defendants proceeded to question DeLuca about the contents of the letter.  For

instance, defense counsel represented to DeLuca that they had identified "fundamental errors in [his] unit of measure adjustments for two particular drugs" and asked DeLuca whether he would look into potential mistakes in his analysis. (DeLuca Dep., p. 695.) Defense counsel then continued to ask DeLuca substantive and detailed questions regarding his analysis, continually referring to information contained in the February 20, 2009 correspondence. (Id., pp. 695-721.) DeLuca repeatedly responded that his goal was to be as accurate as possible and offered to adjust his analysis to "be as accurate as possible" if the information contained in the February 20, 2009 correspondence was more accurate than the initial information provided to him. (See Id., p. 718.)

Thereafter, on April 10, 2009, DeLuca submitted the four-page errata sheet (with voluminous addenda) which Defendants object to and is central to the issues before the Court. On July 7, 2009, oral argument was held on the propriety of the errata sheet and on several Daubert motions, including the motion pertaining to DeLuca.[2]

## III.  DeLuca's Errata Sheet Is Admissible Under Fed. R. Civ. P. 30(e)

Citing primarily to Tenth Circuit cases, Defendants first argue that DeLuca's errata sheet is inadmissible because it makes impermissible substantive changes to his deposition testimony. (Def.'s Mot. for Sanctions, pp. 13-14.) These cases frown upon any effort to change answers made by a deponent under oath, likening a deposition transcript to answers to an in-class exam that the student tries to change after receiving a failing grade. See Summerhouse v. HCA Health Servs. of Kansas, 216 F.R.D. 502, 510-11 (D. Kan. 2003); Foraker v. Schauer, 2005 WL 6000493 (D. Colo.

_____

[2]Defendants' other Daubert motions to exclude Plaintiffs' expert witnesses Verscharen and Katona were denied from the bench. (Order dated July 10, 2009.) Plaintiffs' motion to exclude Defendants' expert witness Fein was denied as moot; however, Plaintiffs reserved the right to move to exclude any portion of Fein's testimony at the time of trial. (Order dated July 14, 2009.)

Sept. 8, 2005).

Both parties acknowledge that other courts are split over whether deponents may use their errata sheets to make substantive changes to testimony. However, the majority rule, as laid out in Wright and Miller, Federal Practice and Procedure, § 2118, and followed by District Courts in this Circuit, is that a deponent may "make changes that contradict the original answers given, even if those changes are not supported by convincing explanations, as long as the deponent complies with the instructions provided within the rule itself for making such changes." Consulnet Computing, Inc. v. Moore, 2008 WL 5146539, *9 (E.D. Pa., Dec. 5, 2008). See also, Agrizap, Inc. V. Woodstream Corp., 232 F.R.D. 491, 493, n.2 (E.D. Pa., Jan. 19, 2006) (noting the majority of federal courts interpret Rule 30(e) to permit deponent to make "any kind of changes."). Under this broader interpretation of the rule, all of the deponent's answers, including old and new, remain a part of the record, and Defendants are free to cross-examine the witness at trial on his contradictory answers. Id. Thus, we hold that DeLuca's errata sheet is admissible under Fed. R. Civ. P. 30(e).[3]

**IV. DeLuca's Errata Sheet Is Not a Third Expert Report**

Defendants also complain that Plaintiffs used DeLuca's errata sheet as a guise to submit a

---

[3]Defendants also assert that, under the express language of Rule 30(e)(1), DeLuca's signed errata sheet was due thirty (30) days after he was notified that the transcript or recording was available. DeLuca received e-mail notification with a copy of the transcript attached on March 9, 2009. (Def.'s Mot. for Sanctions, Ex. 2.) DeLuca signed his errata sheet on April 10, 2009, two days after the expiration of the 30-day deadline. Plaintiffs counter that Defendants failed to take into account Rule 6(d) in their computations, which allows an additional three (3) days when service is made via electronic mail. See Fed. R. Civ. P. 6(d); 5(b)(2)(E). When taking into account 6(d), the deadline would have fallen on April 11, 2009, a Saturday. Thus, Plaintiffs would have had until Monday, April 13, 2009 to submit the errata sheet and, thus, we agree with Plaintiffs's reading of the rules and find that DeLuca's errata sheet was timely completed.

third report beyond the expert report deadlines.  Defendants particularly take issue with the errata sheet's addenda, which they allege contains changes to DeLuca's initial calculations and sets forth new opinions.  Plaintiffs respond that the submission of the errata sheet and addenda was necessary because Defendants presented DeLuca with new information during his February 27, 2009 deposition.  Plaintiffs particularly cite to defense counsels' February 20, 2009 correspondence, and the fact that defense counsel explicitly invited DeLuca to review his calculations.  Defendants counter that the information contained in the February 20, 2009 correspondence was not new, had previously been available to Plaintiffs' counsel and DeLuca and, thus, the errata sheet and addenda with new calculations should be excluded.

In determining whether the opinions contained in the disputed errata sheet and addenda are admissible, we first attempt to decipher whether Defendants' February 20, 2009 correspondence contained information that was not previously known to Plaintiffs and DeLuca.  Several issues the Court has been asked to resolve turn on this question and, thus, careful scrutiny of this correspondence follows.

As a starting point, we note that DeLuca's original opinions generally focus upon calculating the price differences between what Plaintiff paid for certain drugs and what they believe they would have paid had Priority not breached the DSA.  DeLuca undertook these calculations by "comparing the prices paid by ASP versus the prices paid by Defendant(s) for the same products in the same time periods."[4]  (Nov. 7, 2008 DeLuca Rept., p. 10.)

---

[4]Because Defendants, Express Scripts and CuraScripts, owned Priority during this time, the prices Defendants paid for drugs directly correlate to the prices Priority was able to secure for those drugs.

The February 20, 2009 correspondence from defense counsel, which, in part, prompted the contested errata sheet and addenda, primarily criticizes DeLuca's methodology regarding his unit of measure ("UOM") adjustments.  For instance, this correspondence states, "as we continue to review Mr. DeLuca's latest analysis, and upon closer examination of the limited data we received from you a little over one week ago, we believe we have uncovered several additional and substantial errors in Mr. DeLuca's UOM adjustments and assumptions that we feel compelled to bring to your attention."  (See Pl.'s Resp. to Def.'s Mot. for Expedited Daubert Hearing, Ex. 5, p. 5.)

Because Plaintiffs and Defendants use different systems to manage their companies' purchasing data, both parties agree that when comparing each companies' purchasing and sales data, unit of measure adjustments are necessary to calculate damages.  Significantly, Defendants explain in their February 20, 2009 correspondence that their pharmacy data system typically records the number of units purchased as the "smallest dispensing unit."  However, according to Defendants, when that particular unit's volume is a fraction (i.e., 1.17 ml or 1.5 ml), it is adjusted at the "next highest whole number."  Thus, according to Defendant, a correct unit of measure adjustment by DeLuca would have to take this "rounding-up" into account.  Defendants provide an example of their "rounding-up" system and what they deem a correct unit of measure adjustment for the drug Follistism:

> Since First DataBank was pricing per ml, and Medispan per cartridge [1.17 ml], there is a 0.17 ml difference between the two units. Because there is a 1.17 ml cartridge, CuraScript Pharmacy/Atlas inventories it as two dispensing units, rounding to the next highest ml.  Since the unit is rounded up, the price recorded in Atlas is divided in half, to maintain accurate purchasing records and inventory for the total purchased.  Accordingly, if you review

> CuraScript Pharmacy's Atlas purchase records for January 11, 2006,
> you will see that 96 CuraScript/Atlas dispensing units were
> purchased…[t]his means that CuraScript Pharmacy purchased 48
> [cartridges].

Stated another way by Defendant:  "In order to get CuraScript Pharmacy's price per milliliter, one

would need to take the price per unit, multiply by two (2 units per 1.17 cartridge), and divide the

price per cartridge by 1.17 (1.17 mls per cartridge.)  (Def.'s Mot. to Exclude, p. 20.)

During DeLuca's first deposition, he explained the unit of measure he used for the same

drug, Follistism as follows: "[w]e did adjust this drug, Follistism, for unit of measure.  We reduced

the CuraScript price.  Since it was in a dosage of 1.17, we had reduced that to reflect just a 1.0-

milliliter." (DeLuca Dep., 73:24-75:13.)  Thus, Defendants complain that DeLuca did not perform

any "rounding-up" and dividing, and consequently, they assert that his unit of measure adjustment

and resulting damages calculations are incorrect.  For purposes of the motion before the Court,

Defendants urge that this and other flaws render DeLuca's opinions so unreliable that preclusion

of his opinions is warranted.

As an attachment to their February 20, 2009 correspondence, Defendants also produced a

14-page spreadsheet that revealed their computer system's "rounding-up" as it affected each drug

and provided the necessary information for the correct unit of measure adjustments.[5]  Despite not

producing this spreadsheet and the February 20, 2009 correspondence until one week before

DeLuca's second deposition, Defendants, nonetheless, insist that DeLuca had at his disposal, all the

necessary information to make the correct unit of measure adjustments well before his second

deposition.  In making this argument, Defendants point to the deposition of their 30(b)(6) designee,

---

[5]Defense counsel acknowledged that this spreadsheet was created at their request.
(Daubert Hr'g. Tr., 38:23.)

Travis Krajco, and his answers to Plaintiffs' counsel's questions on this subject, which Defendants assert clearly explain the correct conversion process.

This deposition first reflects that Plaintiffs' counsel showed Krajco a document gleaned from Defendants' recording system, Atlas, and asked Krajco to explain the meaning of the data that was maintained in each column of the database. (Krajco Dep., 27:20-24 - 28:2-4, 30:2.) For instance, referring to "column I," labeled "QTY RECV," Plaintiffs' counsel asked, "[c]ould you just tell us what that means and what that's for?" (Id. 40:9-11.) Krajco answered, "That's the quantity received. So for that drug item in line 10, we purchased 5,040 pills . . . the Atlas system and most systems breaks it down into the smallest unit of measure, which would be tablet." (Id. 40:12-22.) A few questions later, Plaintiffs' counsel asked Krajco to explain the next column, labeled "Unit Cost," to which he responded, "Unit cost is the unit we are paying per tablet . . . [a]nd that's – just like I said, it breaks it down to its smallest unit of measure, by tablet." (Id. 45:6-13.) Importantly, at no time during this questioning did Krajco explain the "rounding-up" conversion process detailed above, as set forth in defense counsels' February 20, 2009 correspondence.

Plaintiffs' counsel asked further questions of Krajco regarding Defendants' method of unit pricing as follows:

> Q. Okay. Does CuraScript ever convert the unit cost into a number based upon a different unit of measure? For example, on this first example we have, you're doing it per tablet. Does CuraScript ever convert the unit cost into a number based upon a different unit of measure?
>
> A. No.
>
> Q. Yeah. Let me give a different example that may be – sometimes drugs, injectables we'll say, come in .5 milliliter vials, right?

9

A.  Uh-huh.

Q.  When you have a unit cost on this data for that particular item description for .5 milliliters, is the unit cost reflecting the cost for each .5 milliliter?

A.  Yes.

Q.  Okay.  Does CuraScript ever convert that to say, "We want to figure out the cost per milliliter instead of per .5 milliliter," and have a separate column for that anywhere?

A.  Not to my knowledge.  I don't know what would be the purpose of it.

(Id. 45:23 - 46:19.)

The above questioning further demonstrates that Krajco could have, but did not, explain Defendants' conversion process or the "rounding-up" method.  This conclusion is further confirmed in ensuing portions of the Krajco deposition, which reads:

Q.  Okay.  And there's – under column I it says 2,856.  What is your understanding of what column I is telling us about the Rebif purchase?  How many items or what – how many units are being purchased?

A.  2,856 units.

Q.  And what is the thing that's being purchased that adds up to 2,856?

A.  Syringes.

Q.  Okay.  And each syringe contains .5 milliliter according to that description, right?

A.  The description of the drug, yes.

Q.  Okay.  And the price for each .5 milliliter is $143.03, right?

A.  No.  Each syringe is 143.06.

10

Q. Each syringe?

A. Of .5.  So yes, I guess in essence, yes, .5 is 143.03.

Q. Okay.

A.  But we break it down by syringe, not ML.  We dispense by syringe.

Q. Right.  And if the syringe has .5 in it . . . that's what that unit is measuring; it's measuring the price for each .5 syringe?

A. Yes.

(Id., 47:20 - 48:22.)[6]

Given the 30(b)(6) testimony provided by Krajco, detailed above, we conclude that Defendants' conversion process was not clearly relayed to Plaintiff, and thus, in turn to DeLuca, in a timely fashion.  Defendants' conversion process is somewhat confusing and in our view, the discovery process should not require Plaintiff to decipher this process through the receipt of piecemeal and unclear information.  Rather, discovery should entail the exchange of information in a way that each party clearly understands the other party's position. As the Supreme Court stated in United States v. Procter & Gamble Co., 356 U.S. 677, 682 (1958), "the modern instruments of discovery are thus a principal means by which trials are rendered less a game of blind man's bluff and more a fair contest with the basic issues and facts disclosed to the fullest practicable extent;" see also, Auerbach v. Rival Mfg. Co., 879 F.2d 1196, 1201 (3d Cir. 1989) ("It is well-recognized

_____

[6]Krajco also testified that the report produced to Plaintiffs from Defendants' database "does not pull any kind of unit of measure.  It's just broken down into smallest unit." (Krajco Dep., 56:23-24, 57:2-3.)  When asked whether a unit of measure field could be populated on a report from Defendants' database, Krajco responded that he didn't believe so, and that to his knowledge, he had never seen it populated on a report.  (Id., 57:13-22.)

that complete and accurate responses to discovery are imperative to the functioning of the modern trial process.").

Indeed, during oral argument on this issue, we specifically asked defense counsel to identify the precise section of Krajco's deposition where Defendants' conversion process was allegedly correctly and clearly explained.  Careful consideration of the section of the deposition referred to by defense counsel (p. 46, lines 6-19, see, infra, p. 9) reflects that Krajco's testimony was not sufficiently clear or consistent enough to expect DeLuca to have understood Defendants' conversion process and thereafter to have incorporated that understanding into his original reports.  It is somewhat ironic that Defendants point to thirteen (13) lines of a deposition in claiming that Krajco clearly explained their conversion process, while it took their counsel four, single-spaced pages of a nine-page letter to explain the same process in a subsequent letter.

In summary, our review of the voluminous discovery record  reflects that Defendants did not produce a deponent, or clear corresponding information, such that DeLuca could be expected to fully understand Defendants' unit of measure conversions prior to the submission of his expert reports.  DeLuca testified during both of his depositions that he was concerned about the unit of measure conversions, he recognized that accurate measurements would have an impact on his calculations and opinions, and he did his best with the information he was provided.   The Court agrees with DeLuca's characterization of his efforts regarding these issues:

> Q. (Mr. Praiss):  Can you agree with me it's totally inappropriate to compare an apple to half an apple when you're trying to [do] price difference calculations; correct?
>
> A. (Mr. DeLuca):  Right.  And I think this demonstrates in good faith that we were just trying to get it right.  We didn't try to overstate or

understate damages; just trying to get them as accurately as possible.

(DeLuca Dep., 631:10-20.)

DeLuca's errata sheet submission is, thus, a logical extension of the somewhat unusual discovery process in this case. Defendants provided new information to DeLuca during his February 27, 2009 deposition, and he could not, there and then, possibly review, digest, and answer questions about counsel's nine-page letter and 14-page spreadsheet. To the extent that Defendants continue to believe that DeLuca's damage calculations have been a moving target, they will be provided ample opportunity to cross-examine DeLuca on this issue at trial.

## V.  **DeLuca's Expert Opinion Is Reliable Under F.R.E. 702 and Daubert**

Defendants also ask the Court to exercise its gate-keeping function, established by Daubert and its progeny, and prevent DeLuca from providing what they deem to be unreliable expert opinion testimony.[7] Plaintiffs counter that DeLuca's methodology is nothing more than reliable, simple math and that any revisions undertaken by DeLuca were necessary, given the incomplete data produced by Defendants.

As mandated in Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579 (1993), Judges must serve as gate keepers to prevent the introduction of expert testimony reached without proper scientific foundation. The testimony of an economic expert such as DeLuca, is subject to the same reliability threshold as the opinions of more traditional scientific experts. See Elcock v. Kmart Corp., 233 F.3d 734, 744 (3d Cir. 2000) (citing Kumho Tire v. Carmichael, 526 U.S. 137, 141 (1999)).

---

[7]The burden of proof to establish reliability is preponderance of the evidence. Paoli Railroad Yard PCB Litigation v. Southeastern Pennsylvania Transportation Authority, 35 F.3d 717, 744 (3rd Cir. 1994).

Federal Rule of Evidence 702 controls the admissibility of expert testimony and provides:

If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable methods, and (3) the witness has applied the principles and methods reliably to the facts of this case.

Fed.R.Evid. 702.  Defendants base their <u>Daubert</u> challenge on DeLuca's alleged failure to satisfy the second prong - "reliability."

The Third Circuit has extensively discussed the standard for reliability in <u>Paoli Railroad Yard PCB Litigation v. Southeastern Pennsylvania Transportation Authority</u>, 35 F.3d 717 (3d. Cir. 1994).  There, the Court emphasized that:

As we explained in <u>Paoli I</u>, "the reliability requirement must not be used as a tool by which the court excludes all questionably reliable evidence."  <u>Paoli I</u>, 916 F.2d at 857.  The "ultimate touchstone is helpfulness to the trier of fact, and with regard to reliability, helpfulness turns on whether the expert's 'technique or principle [is] sufficiently reliable so that it will aid the jury in reaching accurate results.'" <u>DeLuca</u>, 911 F.2d at 956 (quoting 3 J. Weinstein & M. Berger, <u>Weinstein's Evidence</u> 702[03], at 702-35 (1988)).  A judge frequently should find an expert's methodology helpful even when the judge thinks that the expert's technique has flaws sufficient to render the conclusions inaccurate.

. . .

Thus, as we explained above, we think that the primary limitation on the judge's admissibility determinations is that the judge should not exclude evidence simply because he or she thinks that there is a flaw in the expert's investigative process which renders the expert's conclusions incorrect.  The judge should only exclude the evidence if the flaw is large enough that the expert lacks "good grounds" for his or her conclusions.

<u>Id.</u> at 744-745.

14

Defendants raise five separate reasons as to why DeLuca's opinions are so unreliable as to render them inadmissible:  (1) speculative and fictitious "carry-forward" pricing, (2) use of improper unit of measure adjustments, (3) inconsistent treatment of resale restrictions, (4) inflated and double-counted rebate dollars, and (5) future damages.  We address each in turn below.

### A.  Speculative and Fictitious "Carry-Forward" Pricing

Defendants first assert that DeLuca's opinions are inadmissible because of his use of certain pricing assumptions.  Defendants refer to this method as "carry forward pricing" methodology, and explain that DeLuca's methodology is flawed because:

> For each product NDC [drug identification code], DeLuca calculated the average monthly purchase price from ASP, and compared that to the average monthly price from Defendants' Pharmacy or Distribution division. If Defendants' Pharmacy or Distribution division did not have a purchase for a particular month, the non-zero price was selected as the price for the month"…[Further] "He attributed pricing to Distribution or Pharmacy for periods where there were no records of any purchases for that division.  For example, even though Distribution may have stopped purchasing a product in 2006, DeLuca would take the last 2006 Distribution price and carry it forward on the speculative assumption that Distribution could have purchased that product for the remainder of 2006, 2007, 2008, and so on, at the 2006 price. (Def.'s Mot. to Exclude, pp. 4-5.)

Plaintiffs respond that, given certain instances where the data produced by Defendant reflected that purchases for certain drugs were not made every month, "DeLuca merely carried forward the price from the previous month into the next month when calculating the average price for that month since the drug was obviously available for purchase at that price even if the data did not indicate it was purchased that particular month." (Pl.'s Br. in Opp., p. 28.)  Defendants counter that DeLuca was incorrect in his assumption that Priority could have made purchases at the same price from month to month when there were no purchases recorded.  Defendants argue that DeLuca

should have taken into account rises in wholesale acquisition costs ("WAC") when calculating price differences during those periods.

We conclude that while DeLuca's methodology did require he make certain assumptions, those assumptions are not so unreliable as to render his opinions inadmissible. As explained in Brill v. Marandola, 540 F.Supp.2d 563, 568 (E.D. Pa. 2008), "Federal courts applying the standards established by Rule 702 and 703 have permitted damages experts to make the assumptions of fact necessary to render a sound opinion, as long as such assumptions have a reasonable basis in the available record and are disclosed to the finder of fact." To the extent that DeLuca had to fill in certain missing data, he did so based upon prior reliable data and not, as Defendants imply, out of thin air. An expert's opinion on whether, and/or how much the price of a certain drug increased or decreased and how that may affect that expert's opinion, are questions best left to a fact finder. In short, DeLuca's use of a "carry-forward pricing" methodology creates a factual dispute, not a fatal reliability issue, and Defendants will have ample opportunity to explore those facts and test those assumptions during cross-examination.

### B. Use of Improper Unit of Measure

We have previously dissected this issue under section IV, pages 5 - 13 of this Opinion, but summarize our findings. Defendants' production of data before the close of the fact discovery period in this case did not include complete information to enable DeLuca to finalize his unit of measure conversions. This was true for one of two reasons: either, the information was simply not there, or Krajco failed to clearly and accurately explain how to read certain data that was produced.

During oral argument, Defendants asserted that the calculations and resulting opinions contained in DeLuca's April 10, 2009 errata sheet continued to be unreliable. Defendants provided

examples on specific drugs which they asserted illustrate that while DeLuca claimed to make unit

of measure adjustments, he actually failed to do so.  Defendants relied heavily upon one section of

DeLuca's deposition testimony: "Q: And if you don't make the necessary adjustments in the units

of measure, sir, any resulting alleged price difference damages would be incorrect, is that right?

A: That's correct."  (DeLuca Dep., 254:9-21.)  While this singular answer may provide Defendants

with compelling cross-examination, Defendants' isolated examples of DeLuca's alleged faulty

conversion methods do not render his opinions, which include analysis of approximately 440,000

lines of data and over 500 different drugs purchased during a 3-year period, inadmissible.  (Daubert

Hr'g., 104:10; DeLuca Rpt., p. 14.)

### C. <u>Inconsistent Treatment of Resale Restrictions</u>

Defendants next complain about DeLuca's alleged inconsistent calculations pertaining to

free or discounted products.  Defendants' generally assert that in some instances, DeLuca artificially

decreased Defendants' acquisition costs incorrectly, assuming that discounted or free pricing

Priority could obtain for other classes of customers would also apply to ASP.  Defendants state:

> Pharmaceutical manufacturers sometimes offer free or discounted
> products to limited end users or a specific class of trade . . . . .
> Because the manufacturer designates these products for a particular
> qualified patient physician or end-user, the acquisition costs do not
> reflect a legitimate acquisition price for a pharmacy or distributor.
> While the pharmacy or distributor may still acquire the product
> outside of these programs, it does so at a higher acquisition cost . .
> . . DeLuca acknowledges these distinctions and their importance.
> Yet, without any reasonable justification, sometimes he accounts for
> them in his price-difference calculations, sometimes he does not.
> (Def.'s Mot. to Exclude, pp. 22-23.)

As noted above, even assuming that DeLuca's analysis was flawed, in part, due to his

misapplication of free or discounted pricing, "flaws" in an expert's investigative process do not

render the opinion excludable.   An expert's opinion is suspect when it is based on a "subjective belief" or "unsupported speculation" but remains admissible so long as the process used by the expert is reliable.  Paoli, 35 F.3d at 744-45.

In reaching his conclusions, DeLuca primarily reviewed sales data supplied by Defendants and applied a fairly straightforward methodology comparing price differences between what Plaintiff paid for certain drugs and what they believed they would have paid under the DSA had there been no interference by Defendants.   Even if this Court were convinced that DeLuca's application of certain data and subsequent opinions were "incorrect," that would not render his methodology unreliable.

### D.  Inflated and Double-Counted Rebate Dollars

Defendants next assert that Plaintiffs' inflated and double-counted damages resulting from rebate dollars also renders his opinions excludable.  According to Defendants, who quote from DeLuca's November 7 Report, "[t]hese are not exactly 'price differences,' but DeLuca's assumption that 'ASP would have achieved the same percentage of rebates on their purchases as did Defendant[s]' had ASP ordered products from Defendants.'" (Def.'s Mot. to Exclude, p. 27; DeLuca Nov. 7 Report, p. 55.)  However, Defendants withdrew this argument during oral argument on July 7, 2009, stating that DeLuca had resolved their concerns in his April 10, 2009 errata sheet.

### E.  Future Damages

Defendants also complain that DeLuca's opinions regarding future damages are "speculation and conjecture" because these damages extend through 2010, whereas the DSA terminates in February of 2008.  Defendants raise these claims with little substantive analysis as to why DeLuca's opinions are so unreliable as to render them inadmissible.  Again, to the extent that there are facts

in dispute which DeLuca should or should not have relied upon (here,  the time period of the DSA), a jury will be given the opportunity to sort through these facts and apply their conclusions in assessing each of the parties' respective expert damages witnesses.

### F.  Precedent Relied Upon By Defendants

Finally, Defendants cite extensively to two unpublished District Court cases which they assert stand for the proposition that an economic expert's opinion is not reliable when based on faulty assumptions.  See Total Containment, Inc. v. Dayco Products, Inc., No. Civ.A.1997-CV-6013, 2001 WL 1167506, *4 (E.D. Pa. Sept. 6, 2001); JMJ Enterprises, Inc. v. Via Veneto Italian Ice, Inc., 1998 WL 175888 (E.D. Pa. April 15, 1998).  We find both cases distinguishable.

The expert in Total Containment opined that a portion of the plaintiff's lost sales and profits was attributable to the defendant's price increase.  The court determined that the expert's opinion was unreliable on two grounds.  Total Containment at *4.  First, the expert assumed without justification that the plaintiff's hold on market share would remain constant even after another prominent company entered the market.  Id.  Second, the expert relied on improper sources in determining the respective market shares of plaintiffs' competitors.  Id.  Upon review of the record, the court determined that plaintiffs' expert had failed to explain how his opinions were reliable considering these defects and that the record was devoid of any other sufficient evidence of reliability. Id. at 6.

Here, Defendants do not, and could not, make similar allegations.  DeLuca's assumptions were based on actual drug prices reported in data produced from Defendants.  To the extent DeLuca filled-in-the-blanks for missing drug prices and unit of measure conversions, he did so with

19

justification based on a lack of requested information and he supported the reliability of his methodology with evidence in the record.

In JMJ, the expert was retained to offer an opinion on lost profits. The court determined that his testimony would not be helpful to the trier of fact because of a lack of connection between his opinions and the underlying facts. Specifically, the expert's opinion relied on a projection that plaintiff would double sales annually over an eight-year period, until 2006, based only on data from 1995 and 1996. JMJ Enters. at * 7. The expert did very little to support this projection, relying only on plaintiff's tax returns, which the expert failed to verify despite information from the plaintiff that certain data may not have been recorded accurately. Id. Further, the expert did not know much about the industry and failed to conduct an independent market survey or study or review any research on the business, despite the fact that these were common tools in the expert's field. Id.

Defendants do not make similar allegations here. They do not suggest that DeLuca failed to use any methodology that other economic damages experts would commonly use. They also do not suggest that DeLuca's calculations are based on wholly unverified projections nor do they challenge DeLuca's familiarity with a certain field of expertise.

## VI.  CONCLUSION

In conclusion, we find that DeLuca's expert opinion is based upon "good grounds," meets the threshold set out in Paoli and is, thus, reliable and admissible. While Defendants may be able to highlight flaws in DeLuca's methodology at trial and convince a jury that his opinions are inaccurate, this does not mean his testimony is inadmissible.

For the foregoing reasons, Defendants' Motion to Exclude Deluca (doc. no. 146) and Motion for Sanctions to Preclude DeLuca from testifying (doc. no. 134) are denied.  An appropriate order follows.